Filed 11/25/25  Smith v. Black Diamond Paver Stones & Landscape CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MICHAEL SMITH,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>BLACK DIAMOND PAVER STONES &<br>LANDSCAPE, INC.,<br><br>    Defendant and Respondent. | H052884<br>(Santa Clara County<br> Super. Ct. No. 22CV404731) |

Plaintiff Michael Smith appeals after summary judgment was granted in favor of defendant Black Diamond Paver Stones & Landscape, Inc. on plaintiff's disability discrimination and related causes of action.  Plaintiff had been offered a job as a project design specialist for defendant.  The position required, among other duties, walking a client's property, including on uneven terrain and hills, and measuring the jobsite.  After defendant learned that plaintiff used a walker to walk, they discussed whether he could safely perform the job.  Plaintiff indicated that he had previously "use[d] a helper to measure if the job site is on a hill," and that in places such as San Francisco, it "would be hard to get into back yards."  He suggested a phone sales position as an alternative job, and he ultimately agreed to wait for the possibility that such a position might be created by defendant.  Defendant accordingly told plaintiff not to report to work for training for the project design specialist position.  No full time phone sales position was ultimately created by defendant.

Plaintiff sued defendant. Relevant to this appeal, plaintiff alleged five causes of action under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.)[1]—(1) disability discrimination, (2) harassment, (3) failure to engage in the interactive process, (4) failure to provide a reasonable accommodation, and (5) retaliation— plus a sixth cause of action for wrongful termination in violation of public policy. He also sought punitive damages. Defendant moved for summary judgment, which the trial court granted.

On appeal, plaintiff contends that the trial court erred in granting summary judgment because triable issues of fact exist as to each of the six causes of action and the claim for punitive damages. For reasons that we will explain, we will affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Project Design Specialist Position*

Plaintiff applied to be a project design specialist for defendant. The job posting identified the job responsibilities as including: (1) meeting with prospective clients, (2) "[s]ketching & [m]easuring projects" to develop proposals, and (3) presenting the proposals to prospective clients. Plaintiff understood that the position required him to manage the project from installation through completion. Although the written job posting stated that "[c]ustomer interaction is [v]irtual at this time," plaintiff understood that the job required him to walk around a jobsite to measure.

Roger Van Alst was the owner of defendant. Van Alst testified that when project design specialists meet with a potential client, "they need to sketch and measure a jobsite." In measuring a jobsite, they may need to "traverse up hills to measure for steps and/or walls."

In addition, some backyards might not be landscaped, may have just dirt and gravel, may be active construction sites due to a house remodel, or may have partial demolition

___

[1] All further statutory references are to the Government Code unless otherwise indicated.

2

work by clients who realized the work was going to be too hard for them to complete. Van Alst explained that the jobsites "are always in some form of disarray because that's why we are being invited to do construction projects for them."

The project design specialists create a design and help the client with the selection of products. In helping with product selection, the project design specialist will need to bring catalogs and block and wall samples to the client. An estimate is then prepared.

If the client moves forward with the project, the project design specialist conducts a preconstruction walkthrough, is present during demolition, confirms excavation depth, traverses the areas of demolition and the excavation of footings and trenches, and confirms during installation that the correct materials are being used. The project design specialist will collect final payments.

Peter Smith,[2] who was a manager for defendant, similarly testified that the project design specialist had "to be able to access all aspects of the project," including walking up and down any hills. Smith testified that there was a "very low percentage of [defendant's] appointments that don't have some kind of hill" and that "the South Bay . . . has hills all the way around it."

B. *Job Application, Interviews, and Offer of Employment*

Plaintiff submitted a written job application to defendant. Plaintiff did not answer the application question that asked whether he was able to perform the essential functions of the position. He also left blank the section where the applicant was asked to describe any function that could not be performed. Under this section, the application stated in part, "We comply with the ADA and consider reasonable accommodation measures that may be necessary for eligible applicants/employees to perform essential functions."

---

[2] Peter Smith is not related to plaintiff.

Defendant interviewed plaintiff in September 2021. Plaintiff had three interviews by telephone and/or video with the manager, Smith. Plaintiff also had a phone interview with the owner, Van Alst. Van Alst apparently offered the position to plaintiff during the call.

During the interviews, plaintiff did not disclose that he was disabled, and defendant did not know he was disabled. Nothing offensive was said to plaintiff during the phone or video interviews.

C. *Plaintiff's In-Office Visit to Complete Employment Paperwork*

Plaintiff went to defendant's office for about an hour to sign his employment paperwork in early October 2021. Plaintiff used a walker during the office visit. None of the employees who were at the office at the time asked plaintiff why he was using a walker. Plaintiff testified that no one said anything offensive, discriminatory, or harassing to him at this time. His expected start date, which was when his training would commence, was October 19, 2021, according to the allegations of the first amended complaint.[3]

D. *Communications After Plaintiff's In-Office Visit*

1. **Inquiry about plaintiff using a walker**

On October 5, 2021, plaintiff and manager Smith exchanged friendly text messages regarding plaintiff's meeting with human resources the prior day. Plaintiff and Smith planned to communicate further about plaintiff working for defendant.

Nearly a week later, on October 11, 2021, Smith sent plaintiff the following text message: "Hi Mike, [¶] Didn't forget about you. I was setting up a job site walk with the office and they said you have some mobility challenges? Was it a walker you were using when you came by the office? Is that a permanent thing? Or short term injury thing? [¶] . . . [¶] Most the job sites we have are hard enough to walk on even for me and my two relatively good balanced legs :-)."

---

[3] Smith testified that although plaintiff filled out the "new employee paperwork," he never attended training, which would have been his first day of employment.

## 2. Communications regarding possible accommodations

The next day, on October 12, 2021, after not receiving a response, Smith sent plaintiff the following text message: "Where did you disappear to?"

Plaintiff responded by text message, "Hi Peter, sorry for not getting back to you in a timely manner. I was a little shocked about the job sites hard enough for 2 good legs. I use a walker because of a bad hip. I use a cane when ever I can. My last 2 years of landscape designs, quotes and project managing were done with my handicap. I use a helper to measure if the job site is on a hill, like the 2 golf courses I designed and built. The 2 soccer stadiums as well. San Francisco would be hard to get into back yards, but not in Santa Clara County homes . . if you feel uncomfortable about me being in the field, I understand. [¶] Do you have a person that calls on the leads that don't sell right away, or were forgotten by the sales rep. Sometimes people are just waiting for a call back . . . ."

Smith replied by text message, "Totally, let me talk to Roger about that. Sorry, didn't even think about that. [¶] The things you just don't know from video interviews. [¶] Yeah, after demo the job has to be walked, and just isn't safe without good balance. We also have lots of projects with walls and hillsides, especially during the winter, this would be really difficult. [¶] We can't hire measure techs at this time, it's just not something we do . . . . And we can't just have you hire someone, they wouldn't be covered under our insurance. [¶] I think the phone sales would be the best fit. [¶] Let me talk to the boss about that. I'll call you later today."

Plaintiff stated by text message, "Thanks for understanding," followed by a thumbs-up emoji.

Smith responded by text message, "Totally! [¶] Don't want you in anything that would be unsafe."

### 3. Further communication regarding accommodation and cancellation of plaintiff's employment training

The following day, on October 13, 2021, Smith texted plaintiff the following message: "Okay, so let's skip training for now. I talked to Roger, it wouldn't be till January February that we would be looking for a person to make phone calls, but I think you would be awesome at it. [¶] It's just not safe having you on job sites, and we can't bring in measure techs. [¶] So for now, no training . . . . . but you are first on our list for a position we don't have yet, but really should make! [¶] How's that[] sound?

Plaintiff replied, "Thanks, sounds good[.]"

Defendant never provided plaintiff with a phone sales position despite plaintiff's inquiries in the subsequent months. An existing employee was working in a part time phone sales position beginning in the summer of 2023. Defendant did not offer the part time position to plaintiff because the other employee had already been doing the job; defendant "just changed [the employee's] job description" to reflect that fact. No full time phone sales position as originally discussed with plaintiff had since been created by defendant.

### E. *Plaintiff's Disability*

Plaintiff has been disabled due to a condition in his hip for 35 years. After a diagnosis in 2010, he began using a cane or a walker when he walked.

### F. *The Civil Action*

Plaintiff filed a first amended complaint against defendant alleging FEHA and tort claims. Plaintiff alleged that he was disabled due to a "painful hip joint," which required him to use a cane or a walker. He alleged that he had been a landscape designer and project manager without any issue for nearly 20 years. Plaintiff alleged that he would have been performing the same duties for defendant. Relevant to this appeal, plaintiff alleged causes of action for (1) disability discrimination, (2) harassment based on disability, (3) failure to engage in the interactive process, (4) failure to provide a reasonable accommodation,

6

(5) retaliation in violation of FEHA, and (6) wrongful termination in violation of public policy.[4]  He also sought punitive damages.

### G. *Defendant's Motion for Summary Judgment*

Defendant filed a motion for summary judgment or, in the alternative, summary adjudication of each of plaintiff's causes of action and his claim for punitive damages. Defendant contended, among other arguments, that (1) plaintiff could not establish a prima facie case of disability discrimination, (2) plaintiff was not subjected to severe or pervasive harassment, (3) the parties engaged in the interactive process, (4) plaintiff could not establish that he was able to perform the essential duties with or without a reasonable accommodation, (5) plaintiff could not establish retaliation, (6) plaintiff could not establish a wrongful termination claim because there was no underlying FEHA violation, and (7) plaintiff could not show malicious, oppressive, or fraudulent conduct to recover punitive damages.

In support of the motion, defendant provided deposition testimony from various witnesses, including manager Smith and plaintiff.  Smith testified that plaintiff was the "only person" who had ever applied for a position outside in the field where Smith "was concerned for [the person's] safety in that position."  Smith testified that there was "only so much you can do with a walker safely, so all of [his] concerns were based on safety.  For example, Smith believed plaintiff would be limited in his ability to measure accurately an entire site and to supervise the installation thereafter.  Smith testified that plaintiff in phone and text communications indicated that he had used a helper in the past to measure jobsites on hills.  Smith testified that he "couldn't hire two people for a job that was slated for one person."

---

[4] Plaintiff also alleged causes of action for discrimination and harassment based on age.  On appeal, plaintiff does not challenge the grant of summary adjudication in defendant's favor on these causes of action.

Plaintiff testified at his deposition that he did not ask defendant for any accommodation. He also testified that he did not need any accommodation to do the job well. However, plaintiff acknowledged at his deposition that he "disclose[d] to Peter Smith that [he (plaintiff)] may need a helper for jobs that he worked on with Black Diamond."

When asked at his deposition about using a helper in the past, plaintiff testified that he did not need a helper to measure unless it was an unusual shape that "any sales rep would want somebody to double check it." For example, he had used a helper for "funny angles" or a "funny design in the yard. Maybe circles and sharp turns." Plaintiff also indicated that he had used a helper to get a "second opinion" on a "big" job. When plaintiff was asked how many times he had used a helper for the "thousand plus" landscape jobs that he had worked on, he estimated 50 jobs that were big projects, such as a golf course and two soccer stadiums.

### H. *Plaintiff's Opposition*

In his written opposition to the summary judgment motion, plaintiff contended that there was direct evidence that he was terminated because of his disability or because he was perceived to have a disability. Plaintiff further argued that there were triable issues regarding (1) the essential functions of the project design specialist position, including whether measuring jobsites on hills was an essential function; (2) whether he could perform the essential functions either with or without an accommodation, and (3) whether there was another vacant position that he could have performed with or without an accommodation. He also argued that there were triable issues regarding his other FEHA claims, his wrongful termination claim, and his claim for punitive damages.

Plaintiff provided deposition excerpts from various witnesses and his own declaration. In his deposition, plaintiff testified that he had "had a sore hip since 1985." He admitted that he was disabled, but he stated that he never had an accommodation at a prior job and that he could do the job for defendant. Plaintiff denied asking manager Smith for a

8

measuring tech. Plaintiff admitted that they did discuss "help," but plaintiff meant help to measure something unusual or to get a "second opinion."

Plaintiff stated in a declaration that, "[d]espite [his] disability," he was able to work at a landscaping design company between 2008 and 2015, without getting injured. According to plaintiff, he frequently walked jobsites that had debris, deconstructed hard surfaces, and uneven terrain. His jobs included work in a steep canyon and a golf course on a mountain. Plaintiff stated that he was able to perform all the tasks necessary to his job, including moving about the worksites without issue, taking measurements, and managing the progress on the construction site. Plaintiff continued working on landscaping jobs as an independent contractor beginning in 2016.

In his declaration, plaintiff stated that he was "shocked and humiliated" by manager Smith's text "implying that [plaintiff's] legs were not good or balanced. Plaintiff stated in his declaration that he could perform all the duties for the project design specialist position, and he did not believe his disability would affect his work for defendant. Plaintiff stated in his declaration that he could measure a property, "traverse up hills to measure up steps and/or walls," "traverse into backyards that . . . may not be already landscaped and then measure those areas," "show block and wall samples to the client," "traverse areas of demolition and excavation of footings and trenches to confirm that the project is being installed correctly and materials are correct," and "navigate through unfinished dirt and gravel terrain that contains broken up pieces of concrete."

In his declaration, plaintiff stated that when he used helpers to measure in the past, it was for projects that were an "abnormal shape" or "abnormally large" where "having multiple people confirm the mathematical calculations and measurements is beneficial." He denied needing a helper because of his disability. Plaintiff stated that because manager Smith "was worried about [plaintiff's] disability," he "tried to assuage [Smith's] fears by explaining that [he (plaintiff)] could use a helper to measure sites on a hill . . . ." According

to plaintiff, he "merely was trying to make Peter Smith more comfortable with allowing [plaintiff] to do [the] job."

Plaintiff stated in his declaration that he suggested an inside sales position as an alternate job because he "[f]ear[ed]" defendant was not going to hire him, and he needed the job. According to plaintiff, he had "no choice" but to agree to the inside sales position that manager Smith indicated might be created early in the following year. Plaintiff stated that he never heard back from defendant about the position despite his phone inquiries between December 2021 and February 2022.

Plaintiff also provided deposition testimony from manager Smith. Smith testified that upon learning that plaintiff used a walker, Smith was concerned that plaintiff would not be safe on a jobsite. Smith explained that a jobsite included open trenches and deer trails or pathways that are 18 inches wide, which Smith believed would be difficult and unsafe to navigate with walker. Smith testified, "[I]f you're going down . . . a little 18-inch deer trail in mud on a side of a hill with open trenches that you're jumping over just to measure a retaining wall, you need balance. . . . You need relatively good balanced legs."

Regarding the "functions of the position" that "would be limited by [plaintiff's] mobility challenges, Smith referred to plaintiff's ability to accurately measure the entire site and then supervise the installation after the concrete had been demolished, when the ground was not flat. Smith also referred to retaining walls, which are generally in an area that is steep or inaccessible. According to Smith, to "sell a wall," the project design specialist would need to be able to "navigate a steep, inaccessible area of someone's yard." This was "really a challenge for everybody," and Smith believed that plaintiff could not do it safely with a walker.

Smith testified that the conversations thereafter with plaintiff were "based around safety." When Smith described the job and the safety aspects to plaintiff, plaintiff indicated that he could bring a helper. Regarding helpers, it was Smith's understanding that plaintiff was able to do his job in the past, such as measure jobsites on hills, with the assistance of a

10

helper. However, Smith testified that he ran a "commission-only sales team" and could not assign "commission-only salespeople" as helpers to plaintiff because there was no pay for those people to help someone else measure a job. Smith also testified that he could not hire two people for a job that was slated for one person. Smith testified that "a very high percentage" of defendant's appointments involved jobsites on a hill.

Smith testified that plaintiff was very excited about a possible alternate phone sales position, so they never discussed further what was needed for plaintiff to perform the job duties of a project design specialist. Smith testified that there had not been an opening for a full time phone sales position since he had talked with plaintiff.

The owner, Van Alst, testified that he was concerned for plaintiff's safety in the project design specialist position after learning that he had used a walker when visiting the office. Van Alst testified that it would be "unsafe" for a person with "mobility limitations with a walker or a cane" to be on jobsites. Van Alst stated that the position "require[s]" a person to "traverse terrain that is . . . not safe for an individual who would have mobility challenges that required a walker or even a cane." Van Alst further stated, "Construction jobsites particularly in landscape, both for the design and estimating process as well as the checking in on . . . [the] construction process, those jobsites are going to have difficult terrain to traverse and navigate on the designing and estimating phase to do measurements into the corners of the property into areas that are likely to be unfinished. [¶] And then . . . the jobsite itself during construction is going to have broken concrete, . . . excavated areas, trenches and footings. So they are . . . quite the opposite of anything that would be ADA compliant. [¶] Construction in general is inherently . . . an environment that is not finished terrain."

Van Alst testified that it was his understanding that Smith and plaintiff had communicated about mobility issues and that plaintiff indicated he would need a helper. Van Alst testified that defendant did not have measure techs or helpers for project design specialists and that it was "not something we'd reasonably be able to do." According to

11

Van Alst, it was "too much additional labor for one job." For example, if another employee helped plaintiff, it would have taken that employee away from the employee's own essential duties.

Plaintiff provided a declaration from a general contractor who had experience in construction, remodeling, and landscape design. The general contractor had been retained by plaintiff to offer an opinion about the tools used in the construction industry to measure terrain, including steep terrain. The general contractor identified specialized software and specialized devices "now widely adopted across the industry," the cost of such tools, and a comparison to traditional methods of measuring, such as with a tape measure or other manual tools requiring site visits. The general contractor stated that the specialized tools could be used "to measure area and/or slope of [the] terrain from either a single point in the terrain, or without visiting the site at all."

Plaintiff filed objections to some of defendant's evidence.

## I. *Defendant's Reply*

In reply, defendant contended that plaintiff's opposition was filed one day late and therefore should not be considered. Defendant also contended that the declaration from the general contractor was inadmissible because, among arguments, the general contractor had no personal knowledge about the facts of the case.

## J. *Hearing and Trial Court's Order*

After a hearing on defendant's motion, the trial court filed a written order. The court overruled all of plaintiff's evidentiary objections. The court also considered plaintiff's opposition to the motion notwithstanding defendant's objection that it was untimely. The court granted the motion for summary judgment. Judgment was thereafter entered in favor of defendant.

## II. DISCUSSION

On appeal, plaintiff contends that the trial court erred in granting defendant's summary judgment motion because there were disputed factual issues as to each cause of action and the claim for punitive damages.

We first address the procedural defects raised by the parties regarding the summary judgment papers filed in the trial court. We then set forth the standard of review for an order granting summary judgment before analyzing plaintiff's contentions as to each cause of action.

### A. *Procedural Defects in the Summary Judgment Papers*

Defendant contends that plaintiff's opposition to the summary judgment motion was filed one day late. Defendant argues that the trial court's grant of summary judgment should therefore be affirmed on this procedural ground.

A trial court has discretion to consider opposition papers that are not timely filed. (See *Mackey v. Trustees of California State University* (2019) 31 Cal.App.5th 640, 657.) In this case, plaintiff submitted a declaration from his counsel's office explaining the problem that counsel's office encountered with electronic filing. The trial court ruled that it would consider plaintiff's opposition papers. Defendant fails to demonstrate that the trial court abused its discretion in considering plaintiff's opposition papers under the circumstances.

Plaintiff contends that if this court determines that his opposition papers should not have been considered by the trial court, then defendant's summary judgment motion also should not have been considered by the trial court because it exceeded the page limit. Because no abuse of discretion has been shown in the trial court's consideration of plaintiff's late filed opposition papers, we need not consider plaintiff's argument further.

We therefore turn to the substance of the parties' summary judgment motion and opposition papers.

### B. *Standard of Review*

A defendant moving for summary judgment or summary adjudication has the initial burden of showing that an element of a cause of action cannot be established, that there is an affirmative defense to the cause of action, or that there is no merit to a claim for punitive damages. (§ 437c, subds. (f)(1), (*o*)(1), (2) & (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) If the defendant make a prima facie showing that justifies a judgment in the defendant's favor, the burden shifts to the plaintiff to make a prima facie showing of the existence of a triable issue of material fact. (§ 437c, subd. (p)(2); *Aguilar, supra*, at pp. 850, 849.)

"The materiality of a disputed fact is measured by the pleadings [citations], which 'set the boundaries of the issues to be resolved at summary judgment.' [Citations.]" (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1250 (*Conroy*).) "Accordingly, the burden of a defendant moving for summary judgment only requires that he or she negate plaintiff's theories of liability as alleged in the complaint . . . . [Citations.]" (*Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 493 (*Hutton*).) "Furthermore, ' " ' "[t]he [papers] filed in response to a defendant's motion for summary judgment may not create issues outside the pleadings and are not a substitute for an amendment to the pleadings." ' [Citation.]" ' [Citation.]" (*Ibid.*)

"A party cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact. [Citation.]" (*LaChapelle v. Toyota Motor Credit Corp.* (2002) 102 Cal.App.4th 977, 981.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar, supra*, 25 Cal.4th at p. 850, fn. omitted.)

14

" 'On review of an order granting . . . summary judgment, we examine the facts presented to the trial court and determine their effect as a matter of law.' [Citation.] We review the entire record, 'considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained.' [Citation.] Evidence presented in opposition to summary judgment is liberally construed, with any doubts about the evidence resolved in favor of the party opposing the motion. [Citation.]" (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.) "The trial court's stated reasons for granting summary judgment are not binding on us, because we review the court's ruling, not its rationale. [Citations.]" (*Maksimow v. City of South Lake Tahoe* (2024) 106 Cal.App.5th 514, 522.)

### C. *Disability Discrimination*

In the first amended complaint, plaintiff alleged that he was disabled due to a "painful hip" condition that required him to use a cane or a walker. He alleged that he accepted a job offer from defendant to work as a project design specialist. However, upon defendant discovering that plaintiff used a walker and a cane for a bad hip, defendant did not allow plaintiff to commence work in the agreed position or in an inside sales position making calls. In the cause of action for disability discrimination under FEHA, plaintiff alleged that defendant took "adverse employment actions" because of his disability.

In its motion for summary judgment, defendant contended that plaintiff could not establish a prima facie case of disability discrimination. To establish a prima facie case, defendant argued that plaintiff had to prove: (1) he suffered from a disability or was regarded as suffering from a disability, (2) he could perform the essential duties of the job with or without accommodation, and (3) he was subjected to an adverse employment action because of a disability or perceived disability.

Defendant contended that plaintiff could not establish the second requirement—that he could perform the essential duties with or without a reasonable accommodation—

15

because providing a helper was not a reasonable accommodation and defendant was not legally required to hire plaintiff for a different position that did not exist.

Defendant further contended that it had a legitimate nondiscriminatory reason for not hiring plaintiff. Specifically, defendant argued that plaintiff needed a helper to perform the essential functions of the job and defendant was not legally required to hire a helper for plaintiff.

In opposition, plaintiff contended that there was direct evidence that defendant knew or perceived him as having a disability and that it terminated him because of his disability. Plaintiff further argued that there were triable issues regarding (1) the essential functions of the project design specialist position, including whether measuring jobsites on hills was an essential function; (2) whether he could perform the essential functions either with or without an accommodation, (3) whether the accommodation would have resulted in an undue hardship on defendant, and (4) whether there was another vacant position that he could have performed with or without an accommodation.

The trial court determined, among other things, that defendant met its initial burden by showing that measuring, including walking, the jobsites was an essential duty for the position, and there was no reasonable accommodation proposed by plaintiff that would have allowed him to perform the duty without endangering his health or safety. The court disagreed with plaintiff that there was direct evidence of discrimination. The court also found that plaintiff's evidence did not create a triable issue of material fact.

On appeal, plaintiff contends that there was direct evidence that defendant's employment actions were motived by his disability. Specifically, defendant made "repeated statements that it ended [plaintiff's] training because of safety concerns . . . ." To the extent there was no direct evidence of discrimination, plaintiff argues that there were triable issues regarding (1) whether he was disabled or perceived as disabled, (2) whether he was able to perform the essential functions of the job with or without accommodation, and (3) whether his disability or perceived disability was a substantial motivating reason for his termination.

16

### 1. General legal principles regarding disability discrimination

FEHA generally makes it unlawful for an employer to "refuse to hire or employ" a person, "to bar or to discharge" a person from employment, or "to discriminate against" a person in the "terms, conditions, or privileges" of employment "because of" the person's "physical disability." (§ 12940, subd. (a).)

A physical disability includes "any physiological disease, disorder, [or] condition" that affects a "body system[]" and "[l]imits a major life activity." (§ 12926, subd. (m)(1)(A), (B).) A condition "limits a major life activity if it makes the achievement of the major life activity difficult." (§ 12926, subd. (m)(1)(B)(ii).) Generally, " '[l]imits' shall be determined without regard to mitigating measures or reasonable accommodations . . . ." (Cal. Code Regs., tit. 2 (hereafter 2 California Code of Regulations), § 11065, subd. (*l*)(3)(C).) Mitigating measures include "[u]se of assistive technology or devices, such as wheelchairs, braces, and canes." (*Id*., § 11065, subd. (n)(2).) Major life activities include walking and working. (*Id.*, § 11065, subd. (*l*)(1); § 12926, subd. (m)(1)(B)(iii).)

A person who uses a cane to walk may be physically disabled under FEHA. (*Sandell v. Taylor-Listug, Inc*. (2010) 188 Cal.App.4th 297, 311.) "One could reasonably infer from evidence that a person uses a cane to walk that he needs the cane to walk, and is therefore limited with respect to a major life activity, as defined under FEHA." (*Id.* at p. 312, italics omitted.)

A physical disability under FEHA also includes "[b]eing regarded or treated by the employer" as having a physical disability. (§ 12926, subd. (m)(4).) In other words, "applicants and employees are protected from discrimination due to" a "perceived physical . . . impairment that is disabling . . . or perceived as disabling . . . ." (§ 12926.1, subd. (b).) As a result, FEHA "provide[s] protection when an individual is erroneously or mistakenly believed to have any physical . . . condition that limits a major life activity." (§ 12926.1, subd. (d).) "California law does not require an employee with an actual or

17

perceived disability to prove that the employer's adverse employment action was motivated by animosity or ill will against the employee." (*Wallace v. County of Stanislaus* (2016) 245 Cal.App.4th 109, 115 (*Wallace*).)

However, FEHA "does not prohibit an employer from refusing to hire or discharging an employee with a physical . . . disability, or subject an employer to any legal liability resulting from the refusal to employ or the discharge of an employee with a physical . . . disability, if the employee, because of a physical . . . disability, is unable to perform the employee's essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger the employee's health or safety . . . even with reasonable accommodations." (§ 12940, subd. (a)(1).)

### 2. Proving disability discrimination

To establish a prima facie case of disability discrimination, the plaintiff must present evidence demonstrating that the plaintiff "(1) suffered from a disability, or was regarded as suffering from a disability, (2) could perform the essential duties of the job with or without reasonable accommodations, and (3) was subjected to an adverse employment action because of the disability or perceived disability. [Citation.]" (*Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 235 (*Moore*).)

In this case, regarding the first element—that plaintiff "suffered from a disability, or was regarded as suffering from a disability" (*Moore*, *supra*, 248 Cal.App.4th at p. 235)—the parties dispute whether plaintiff may proceed on the theory that defendant regarded him as disabled. We need not decide this issue. Plaintiff alleged in the first amended complaint that he was "disabled" because he "must walk using a cane or walker due to a painful hip joint." (See *Hutton*, *supra*, 213 Cal.App.4th at p. 493 [explaining that "the burden of a defendant moving for summary judgment only requires that he or she negate plaintiff's theories of liability as alleged in the complaint"].) Defendant, in moving for summary adjudication of plaintiff's disability discrimination claim, contended in its separate statement of undisputed facts that plaintiff had a disability. Plaintiff's responding separate

18

statement likewise identified this fact as undisputed. Given that the parties did not dispute for purposes of the summary judgment motion that plaintiff was disabled, the first element of plaintiff's prima facie case of disability discrimination was established. We need not decide whether plaintiff could properly proceed on the alternative theory that he was regarded as disabled.

Regarding the third element of a prima facie case of disability discrimination, "an employer has treated an employee differently 'because of' a disability when the disability is a substantial motivating reason for the employer's decision to subject the employee to an adverse employment action." (*Wallace*, *supra*, 245 Cal.App.4th at p. 128.) This may be established by evidence "that the motive for the employer's conduct was related to the employee's physical . . . condition." (*Id.* at p. 123.)

"[I]n cases where there was no direct evidence that the adverse employment action taken by the employer was motivated by" improper criteria, "proof of discriminatory motive is governed by the three-stage burden-shifting test established by the United States Supreme Court in" *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*). (*Wallace*, *supra*, 245 Cal.App.4th at pp. 122-123, fn. omitted.)[5] However, where there is direct evidence of the employer's motive, "[c]ourts have held that the three-stage *McDonnell Douglas* framework does not apply . . . ." (*Zamora v. Security Industry Specialists, Inc.* (2021) 71 Cal.App.5th 1, 34; accord, *Glynn v. Superior Court* (2019) 42 Cal.App.5th 47, 53 (*Glynn*).)

"[D]isability discrimination cases often involve direct evidence of the role of the employee's actual or perceived disability in the employer's decision to implement an

[5] "The three stages are (1) the plaintiff making a prima facie showing of employment discrimination, (2) the employer producing a legitimate reason for the adverse employment action, and (3) the burden shifting back to the plaintiff to prove intentional discrimination by offering evidence of the employer's discriminatory motive, which can include attacking the employer's proffered reasons as pretexts for discrimination. [Citation.]" (*Wallace*, *supra*, 245 Cal.App.4th at p. 123.)

19

adverse employment action." (*Wallace*, *supra*, 245 Cal.App.4th at p. 123, italics omitted.) For example, in *Wallace*, the employer placed the employee on unpaid leave based on a doctor's report regarding the employee's physical limitations. (*Id.* at p. 123, fn. 9.) The employee alleged that the employer had made an "incorrect assessment that he could not safely perform his duties . . . even with reasonable accommodation." (*Id.* at p. 115.) The appellate court determined that under the circumstances, there was "direct evidence of the employer's motivation for the adverse employment action." (*Id.* at p. 123) The employee "could prove the requisite discriminatory intent by showing his actual or perceived disability was a ' "substantial motivating factor/reason" ' for [the employer's] decision to place him on a leave of absence." (*Id.* at p. 115; see also *Glynn*, *supra*, 42 Cal.App.5th at p. 53 [finding "direct evidence of disability discrimination" where the employee was terminated based on the employer's "mistaken[] belie[f]" that the employee "was totally disabled and unable to work"].)

In this case, there is direct evidence that "the motive for the employer's conduct was related to the employee's physical . . . condition." (*Wallace*, *supra*, 245 Cal.App.4th at p. 123.) Specifically, defendant did not allow plaintiff to continue in the position of a project design specialist because it believed that, due to a mobility issue, plaintiff could not perform the job duties and there was a safety issue. This is "direct evidence that the employer's motive for taking an adverse employment decision was the plaintiff's actual or perceived disability." (*Id.* at p. 131.)

However, even with direct evidence of the defendant employer's motive, plaintiff must still demonstrate the remaining (second) element of a prima facie case of discrimination, that is, he "could perform the essential duties of the job with or without reasonable accommodations." (*Moore*, *supra*, 248 Cal.App.4th at p. 235; accord, *Green v. State of California* (2007) 42 Cal.4th 254, 264 [holding that "an adverse employment action on the basis of disability is *not prohibited* if the disability renders the employee unable to perform his or her essential duties, even with reasonable accommodation"]; *see id.* at

pp. 262, 265.)[6] Regarding this second element, plaintiff contends that there were triable issues regarding (a) the essential duties of the project design specialist position, (b) whether he could perform those duties without an accommodation, and (c) whether he could perform those duties with an accommodation. We will consider each issue in turn.

### a. Essential Duties or Functions

As we have stated, FEHA does not prohibit an employer from taking an adverse employment action if the employee, because of a physical disability, is unable to safely perform the "essential duties" of the position. (§ 12940, subd. (a)(1).) FEHA defines " '[e]ssential functions' " to mean "the fundamental job duties of the employment position." (§ 12926, subd. (f).)

"A job function may be considered essential for any of several reasons, including, but not limited to, any one or more of the following: (A) The function may be essential because the reason the position exists is to perform that function. [¶] (B) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed. [¶] (C) The function may be highly specialized, so that the incumbent in the position is hired based on expertise or the ability to perform a particular function." (§ 12926, subd. (f)(1)(A)-(C).)

"Evidence of whether a particular function is essential includes, but is not limited to, the following: [¶] (A) The employer's judgment as to which functions are essential. [¶] (B) Written job descriptions prepared before advertising or interviewing applicants for the job. [¶] (C) The amount of time spent on the job performing the function. [¶] (D) The consequences of not requiring the incumbent to perform the function." (§ 12926, subd. (f)(2)(A)-(G); see 2 Cal. Code Regs., § 11065, subd. (e)(2)(A)-(H).)

---

[6] Further, under FEHA, an employer is not subject to liability if the employee cannot safely perform the essential duties even with reasonable accommodation, or the accommodation would produce an undue hardship on the employer. (§ 12940, subds. (a)(1), (m)(1); *Wallace*, *supra*, 245 Cal.App.4th at pp. 123, 126.)

21

" 'Essential functions' does not include the marginal functions of the position." (§ 12926, subd. (f).)  " 'Marginal functions' of an employment position are those that, if not performed, would not eliminate the need for the job or that could be readily performed by another employee or that could be performed in an alternative way."  (2 Cal. Code Regs., § 11065, subd. (e)(3).)

In this case, defendant met its initial burden of establishing that measuring and traversing jobsites, which included hills and uneven terrain, were essential functions of the project design specialist position.  Defendant's job posting listed the duties as including "[s]ketching & [m]easuring projects" to develop proposals.  Owner Van Alst and manager Smith both testified that walking the jobsite was necessary to measure and to oversee the project, including for a pre-construction walk-through, demolition, excavation, and installation, and that the terrain may be uneven and include hillsides.  Plaintiff himself testified that he understood that the position required him to walk around a jobsite to measure.  He also admits on appeal that "manag[ing] the installation of the proposal to completion" was an essential function of the position.[7]

On appeal, plaintiff contends that "measuring on hills" (1) "is a marginal function used only as means to determine the project's design and cost estimate," (2) "is a job function that could be distributed among employees," and (3) could "be accomplished using readily available digital tools that do not require the user to traverse the terrain."

---

[7] At oral argument, plaintiff contended that defendant's written job posting indicated the position was a remote sales position with no in-home visits required.  The actual job posting, however, was not as broad as plaintiff implies and appears to have been limited in time.  Specifically, plaintiff applied for the position in 2021, and the written job posting stated, "Exciting Full Time In-Home Sales (Customer interaction is Virtual at this time)."  Thus, although the posting indicated that interaction with the customer was virtual for some period of time, there is no indication in the posting that other jobsite tasks would or could be conducted remotely.  Indeed, plaintiff understood the position would require him to make site visits, including to walk around to take measurements, and that he would be managing the landscaping projects through completion.

22

We determine that plaintiff failed to create a triable issue of material fact regarding whether measuring a jobsite, including those on hills, is a marginal, rather than an essential, function of the project design specialist position.

First, as we have just explained, the evidence was undisputed that measuring a jobsite, including those on hills, was an essential function of the project design specialist position. Further, plaintiff admitted that the duties for the position included "designing and developing a landscape proposal . . . for the client, then trying to convince the client to purchase the proposal." On appeal, he acknowledges that "[m]easuring on hills" was a "means to determine the project's design and cost estimate," which were themselves essential functions.

Second, in support of his contention that measuring on hills was a job function that "could be distributed among employees," plaintiff refers to the general offers of help that he received from prospective coworkers, who he met in the office when he signed his employment paperwork. However, the record reflects that only one project design specialist would visit a client's property, without any coworker present to help with any duties at the property. It thus does not appear that the job function of measuring on a hill "could be readily performed by another employee." (2 Cal. Code Regs., § 11065, subd. (e)(3).) As the trial court found, it appears that "the duty to sketch and measure, including walking the property, is . . . essential since this duty is limited to the project design specialist, and the position apparently exists for the performance of this function." (See § 12926, subd. (f)(1)(A), (B).)

Third, regarding plaintiff's contention that measuring on a hill could "be accomplished using readily available digital tools that do not require the user to traverse the terrain," we understand plaintiff to contend that the *means* by which he could accomplish the essential function of measuring a jobsite did not require him to traverse any hill. As we explain below, plaintiff's evidence regarding certain digital tools was not sufficient to create a triable issue regarding whether those tools would have been a reasonable accommodation.

23

In sum, on this record, plaintiff failed to create a triable issue regarding whether measuring and traversing jobsites, which included hills and uneven terrain, was an essential function of the design specialist position.

b. *Performance of the Essential Duties Without an Accommodation*

Plaintiff contends that defendant did not present evidence to support its contention that he could not traverse hilly terrain. According to plaintiff, defendant only provided the unsupported opinions of manager Smith and owner Van Alst, "[n]either" of whom had "ever attempted to watch [plaintiff] walk on hilly terrain or construction sites." Plaintiff argues there was a triable issue regarding whether he could perform the essential duties of the position without an accommodation.

We determine that defendant met its initial burden of establishing that plaintiff could not perform the essential duties without an accommodation, and that plaintiff failed to create a triable issue of material fact. Defendant relied on its observations of, and communications with, plaintiff in assessing whether he could perform the essential duties of the position. Specifically, it was undisputed that plaintiff used a walker for his visit to defendant's office. Upon learning that plaintiff used a walker, manager Smith communicated with plaintiff about his "mobility" in relation to the terrain of "[m]ost" of defendant's "job sites." In a response by text, plaintiff acknowledged that (1) he had a "bad hip," which he characterized as a "handicap," and (2) he "use[d] a walker" or "a cane when ever" he could. Plaintiff also stated that he used "a helper to measure if the job site is on a hill," and he admitted that it "would be hard to get into back yards" in San Francisco as an example. He then stated to manager Smith, "[I]f you feel uncomfortable about me being in the field, I understand." Plaintiff then inquired about the availability of a phone sales position. Based on defendant's observations of plaintiff using a walker for an office visit, and his admissions regarding his limited ability to traverse hills to measure, there was no conclusion that could be drawn by defendant other than plaintiff could not traverse jobsites on a hill.

Plaintiff contends that this court should not consider the text messages because defendant's separate statement of undisputed facts did not cite to the text messages in seeking summary adjudication of the disability discrimination claim. In support of this contention, plaintiff quotes the following from *Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107: "Facts not contained in the separate statements do not exist." (*Id.* at p. 112.) *Lewis* also provides, however, that a court may consider both the moving and the opposing parties' separate statements of undisputed facts. (*Ibid.*) In this case, plaintiff provided a copy of the text messages with his opposition to the summary judgment motion and specifically cited to the text messages in his separate statement concerning the disability discrimination claim.

Plaintiff next argues that the evidence does not support the conclusion that he "used a helper in the past because of his disability." (Italics omitted.) He cites to his own deposition testimony and his own declaration in opposition to the summary judgment motion in which he stated that if he used a helper, it was because the project involved an "unusual" or "abnormal" shape or size, or he wanted to get a "second opinion" on a "big" job.

Notwithstanding plaintiff's own beliefs about what he could do, the only reasonable conclusion that could be drawn from what he actually communicated to defendant is that he had a disability, it limited his ability to walk, and he could not traverse jobsites on hills to measure as a result. For example, although plaintiff clearly understood that he was being asked by text message about his mobility in relation to his prospective job duties, he never told manager Smith that he (plaintiff) could walk jobsites on hills with a walker or a cane. To the contrary, he indicated in his text messages that for the "last 2 years of landscape designs, quotes and project managing," his ability was limited such that he had "use[d] a helper to measure if the job site is on a hill." He also referred to San Francisco backyards as being "hard to get into." He then initiated a discussion about the availability of a phone sales job.

Plaintiff contends that he "brought up the idea of [a] helper because . . . Smith told [p]laintiff he could not perform the job, and [p]laintiff was trouble-shooting ideas to appease . . . Smith." Based on our review of the record, however, it appears that Smith began the conversation by asking plaintiff about his mobility and ability to traverse jobsites. Plaintiff could have responded to Smith by explaining why Smith's concerns were unfounded or that they could be adequately mitigated by reasonable accommodations. Instead, plaintiff confirmed that his ability to walk was limited and that he had "use[d] a helper to measure if the job site is on a hill."

Plaintiff argues that his job history before and after defendant's job "demonstrates that [he] could traverse constructions sites—including those on hills and canyons—to take measurements and supervise construction." However, plaintiff did not clearly communicate an ability to traverse construction sites, including on hills, to defendant. Instead, on his job application, plaintiff left blank the question asking whether he could perform the essential functions of the job for which he was applying. Further, the record reflects that he made express representations to the contrary about his ability to perform the essential functions of the job, including that for his "last 2 years of landscape designs, quotes and project managing," he "use[d] a helper to measure if the job site is on a hill." He similarly stated that "San Francisco would be hard to get into back yards . . . ." Consistent with these representations that indicated a limited ability to walk on hills, plaintiff immediately thereafter asked defendant about a phone sales position.

In this situation, where defendant directly asked plaintiff about his mobility in relation to his ability to traverse jobsites, plaintiff had a duty to " ' "cooperate with the employer's efforts by explaining [his . . . ] . . . disability and qualifications. [Citation.]" ' " (*Raine v. City of Burbank* (2006) 135 Cal.App.4th 1215, 1222 (*Raine*).) This obligation included " 'mak[ing] available' " to defendant "information which [was] available, or more accessible," to plaintiff. (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1014 (*Scotch*).) In this case, plaintiff, having expressly conveyed to defendant that his

26

ability to walk was limited by a hip condition, that he recently used a helper to take measurements on hillsides, and that he was interested in a phone sales position—all in response to defendant's inquiry about his ability to walk jobsites—cannot now complain that defendant erred in concluding that he could not walk on hillsides to measure without an accommodation.

Lastly, defendant provided evidence that the essential duties of the position included on-site project management on varied terrain. Plaintiff's evidence in opposition failed to sufficiently address defendant's evidence regarding the need for on-site project monitoring on varied terrain.

In sum, defendant met its initial burden of establishing that plaintiff could not perform the essential functions of the position without an accommodation. Plaintiff's evidence in opposition failed to create a triable issue.

c. *Performance of the Essential Duties with an Accommodation*

Plaintiff contends that there was a triable issue regarding whether he could perform the essential duties of the project design specialist position with an accommodation. He argues that he could have measured any terrain type with various digital or other tools, including one such tool that would not have required a site visit.

We determine that defendant met its initial burden of establishing that plaintiff could not perform the essential duties of the position even with an accommodation, and that plaintiff failed to create a triable issue of material fact. As we have explained, defendant provided evidence that the essential duties of the position required the employee to be onsite on varied terrain for both measuring and project management. In view of plaintiff's concessions by text message about his limited mobility and need for a helper to measure jobsites on a hill, he was required to raise a triable issue about his ability to perform the position's essential functions with accommodation.

However, plaintiff's evidence regarding alternative measuring tools did not create a triable issue of material fact regarding his ability to perform the essential functions of the

27

position with accommodation. As an initial matter, plaintiff never suggested any such alternative measuring tools to defendant as being a reasonable accommodation, nor was there any evidence that plaintiff had used any such tool—instead of a helper—in the past. Further, the existence of alternative measuring tools did not address the requirement that an employee traverse varied terrain for project management.

Moreover, plaintiff's evidence regarding alternative measuring tools was insufficient to create a triable issue even with respect to whether such tools were a reasonable accommodation for measuring jobsites with hills. Plaintiff's evidence consisted of a declaration from a general contractor who identified specialized devices and specialized software that could be used for measuring. As described by the general contractor, one of the tools was a smartphone "app" that allowed the user to "stand at the base of a hillside" and point "upwards toward the hill" to obtain measurements. However, the general contractor did not explain whether the app could also be used to measure if the user was located at some other vantage point, such as the top of the hill looking down. Alternatively, certain software or other tools identified by the general contractor relied on "Google Earth data" or "Google Earth imagery." There was no evidence, however, regarding how often such data or imagery was updated on Google Earth, which could make measurements based on that data outdated or otherwise inaccurate. Lastly, the general contractor stated that all the tools "are" commonly used and that all the technology "is now" widely adopted across the industry. However, these statements failed to establish the extent to which any individual tool was commonly used or widely adopted at the relevant time when plaintiff applied for a position with defendant, such that the tool should have been considered a reasonable accommodation at that time. Likewise, the general contractor's statement that "these tools, or similar versions, have been in use for at least the last five (5) years" created ambiguity as to (a) which tool had the same version five years earlier and (b) whether, if the earlier version differed, it would still have been a reasonable accommodation.

28

In sum, plaintiff failed to demonstrate a triable issue of material fact regarding the essential duties of the project design specialist position or that he could perform those duties with or without an accommodation. Having reached this conclusion, we need not address plaintiff's contention that defendant failed to establish safety as an affirmative defense.

### D. *Failure to Engage in the Interactive Process*

In the first amended complaint, plaintiff alleged that he was disabled and that he needed a reasonable accommodation. He alleged that defendant was aware of his disability "and/or [he] requested [defendant] to provide a reasonable accommodation." According to plaintiff, he "was willing to participate in an interactive process to determine whether reasonable accommodation could be made," but defendant "failed to engage timely in good faith in this interactive process."

In its motion for summary judgment, defendant contended that it was undisputed that the parties engaged in the interactive process by discussing possible accommodations, including an alternative position. Defendant also observed that plaintiff testified at his deposition that he did not need an accommodation and that he did not request any accommodation.

In opposition, plaintiff contended that there were triable issues regarding whether defendant terminated the interactive process "prematurely" before learning the "precise limitations of [his] disability and the types of accommodations which would be most effective." For example, defendant did not consider "commonly available tools of the trade that would have allowed [p]laintiff to measure hilly terrain without traversing the hills themselves."

The trial court determined that, although plaintiff testified that he did not need an accommodation, the parties did discuss possible accommodations. The court also found that at the conclusion of those discussions, which included whether a helper could be hired and whether an alternative position was available, plaintiff indicated his satisfaction with the resolution of the process.

29

On appeal, plaintiff contends that defendant did not engage in the interactive process in good faith. He argues that defendant did not consider "commonly available tools of the trade that would have allowed [him] to measure hilly terrain without traversing the hills themselves." Plaintiff also contends that defendant "did not spend much time trying to get [him] into the phone sales position."

FEHA requires an employer "to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any . . . ." (§ 12940, subd. (n).) During the interactive process, the employer has the " ' "burden to take 'positive steps' to accommodate the employee's limitations" ' " while the employee " ' "retains a duty to cooperate with the employer's efforts by explaining [his or] her disability and qualifications. [Citation.]" ' " (*Raine*, *supra*, 135 Cal.App.4th at p. 1222.) "Both employer and employee have the obligation 'to keep communications open' and neither has 'a right to obstruct the process.' [Citation.] 'Each party must participate in good faith, undertake reasonable efforts to communicate its concerns, and make available to the other information which is available, or more accessible, to one party. Liability hinges on the objective circumstances surrounding the parties' breakdown in communication, and responsibility for the breakdown lies with the party who fails to participate in good faith.' [Citation.]" (*Scotch*, *supra*, 173 Cal.App.4th at p. 1014.)

Generally, an employer "is required to consider any and all reasonable accommodations of which it is aware or that are brought to its attention by the applicant or employee . . . ." (2 Cal. Code Regs., § 11068, subd. (e).) "[A]n employer need not read an employee's mind or provide accommodations of which it is unaware . . . ." (*Lin v. Kaiser Foundation Hospitals* (2023) 88 Cal.App.5th 712, 728 (*Lin*); see also *King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 443 (*King*).)

An employer "shall consider the preference of the applicant or employee to be accommodated . . . ." (2 Cal. Code Regs., § 11068, subd. (e).) However, an employer is generally not required to create a new position to accommodate an employee. (*Cuiellette v.*

30

*City of Los Angeles* (2011) 194 Cal.App.4th 757, 767 (*Cuiellette*); *Raine*, *supra*, 135 Cal.App.4th at p. 1226; 2 Cal. Code Regs., § 11068, subd. (d)(4).)

"To prevail on a claim . . . for failure to engage in the interactive process, an employee must identify a reasonable accommodation that would have been available at the time the interactive process should have occurred.  An employee cannot necessarily be expected to identify and request all possible accommodations during the interactive process itself because ' " '[e]mployees do not have at their disposal the extensive information concerning possible alternative positions or possible accommodations which employers have. . . .' " '  [Citation.]  However, . . . once the parties have engaged in the litigation process, to prevail, the employee must be able to identify an available accommodation the interactive process should have produced . . . ."  (*Scotch*, *supra*, 173 Cal.App.4th at p. 1018; accord, *Miller v. Department of Corrections & Rehabilitation* (2024) 105 Cal.App.5th 261, 282-283 (*Miller*).)

In this case, defendant satisfied its initial burden to show that it engaged in a timely, good faith, interactive process with plaintiff.  Upon learning that plaintiff used a walker, manager Smith communicated with plaintiff about his mobility in relation to the terrain of "[m]ost" of defendant's jobsites, which included "lots of projects with walls and hillsides."  Plaintiff acknowledged that he had a "handicap" and that he "use[d] a walker because of a bad hip" or "a cane when ever" he could.  Plaintiff admitted using a helper for past jobs involving hills, and he admitted that it "would be hard to get into back yards" in San Francisco as an example.  He then inquired about an inside sales job.  Smith indicated that a "measure tech[]" or helper would not be possible, but that he would ask the owner about a phone sales position.  Plaintiff responded by text, "Thanks for understanding," with a thumbs-up emoji.  Smith later stated that a phone position did not exist but that plaintiff would be first on the list for it.  Smith indicated that "it wouldn't be till January February that we would be looking for a person to make phone calls . . . ."  Smith asked how this "sound[ed]" to plaintiff.  Plaintiff thanked Smith and stated that it "sounds good."

Plaintiff failed to demonstrate a triable issue regarding whether defendant engaged "in a timely, good faith, interactive process." (§ 12940, subd. (n).) Plaintiff stated in a declaration that he was simply "tr[ying] to assuage [Smith's] fears" and that he (plaintiff) had "no choice" but to "agree" with the possibility of a future inside sales position. However, whatever plaintiff's subjective dismay, the actual content of his text messages gave defendant (1) no reason to believe that plaintiff desired further interactive process and (2) no reason for defendant to second-guess its determination that the only way of effectively surveying a jobsite, whether for initial measurement or for later project management, was on foot.

Plaintiff contends on appeal that defendant did not consider "tools of the trade" that could have been used in the position. Although plaintiff argues that such tools are "commonly available" and "would have allowed [him] to measure hilly terrain without traversing the hills themselves," plaintiff himself never suggested any such tools to defendant notwithstanding plaintiff's own experience in landscape design. "An employee cannot demand clairvoyance of his employer. [Citation.] ' "[T]he employee can't expect the employer to read his mind and know he secretly wanted a particular accommodation and sue the employer for not providing it." ' " (*King*, *supra*, 152 Cal.App.4th at p. 443.) Plaintiff also does not cite evidence indicating that defendant was or should have been aware during the interactive process of the tools that plaintiff now claims would have allowed him to perform the essential functions of the position. An employer is only required to consider "reasonable accommodations of which it is aware or that are brought to its attention by the applicant or employee." (2 Cal. Code Regs., § 11068, subd. (e).) "[A]n employer need not . . . provide accommodations of which it is unaware." (*Lin*, *supra*, 88 Cal.App.5th at p. 728.) In this case, the record reflects that defendant considered all accommodations proposed through the interactive process, and plaintiff expressed satisfaction to defendant at the apparent resolution.

Plaintiff contends that defendant "did not spend much time trying to get [him] into the phone sales position."  However, the phone sales position did not exist at the time the parties engaged in the interactive process.  Defendant was not required to create a new position to accommodate plaintiff.  (*Cuiellette*, *supra*, 194 Cal.App.4th at p. 767 [explaining that an employer is not required to create a new position to accommodate an employee]; see *Raine*, *supra*, 135 Cal.App.4th at p. 1226 [stating that "FEHA does not require the employer to create a new position to accommodate an employee, at least when the employer does not regularly offer such assistance to disabled employees"]; 2 Cal. Code Regs., § 11068, subd. (d)(4) [providing that an employer "is not required to create a new position to accommodate an employee with a disability to a greater extent than an employer would offer a new position to any employee, regardless of disability"].)

Plaintiff further argues that he contacted manager Smith in December 2021 and January 2022 to follow up about the phone sales position, but Smith did not return his calls.  Smith subsequently testified at his deposition in November 2023 that defendant still had not created a full time phone sales position.  Starting in mid-2023, a preexisting employee was engaged in a part time phone sales position.  Smith testified, however, that plaintiff was not called for the part time position because the other employee had already been doing the job; defendant "just changed [the employee's] job description" to reflect that fact.  "To prevail on a claim . . . for failure to engage in the interactive process, an employee must identify a reasonable accommodation that would have been available at the time the interactive process should have occurred."  (*Scotch*, *supra*, 173 Cal.App.4th at p. 1018.)  "[A]n employer cannot be held liable for failure to engage in the interactive process where the employee is unable to identify a reasonable accommodation that would have been available had the parties engaged in the interactive process. [Citations.]"  (*Miller*, *supra*, 105 Cal.App.5th at pp. 282-283.)  In this case, plaintiff failed to create a triable issue that a phone sales position was available during the time period that he claims the interactive process should have occurred in December 2021 and January 2022.  (*Ibid.*)

33

Accordingly, we conclude that the trial court properly granted summary adjudication of plaintiff's claim for failure to engage in the interactive process.

## E. *Failure to Provide a Reasonable Accommodation*

In the first amended complaint, plaintiff alleged that he was disabled and that he "was able to perform the essential duties of [his] position or a vacant alternative position to which [he] could have been assigned with reasonable accommodation." He alleged that defendant "failed to provide reasonable accommodation for [his] disability."

In its motion for summary judgment, defendant contended that plaintiff could not perform the essential duties with or without a reasonable accommodation. Defendant argued that measuring was an essential function of the project design specialist position and that plaintiff admitted that he could not perform this function without a helper. Defendant contended that it was not a reasonable accommodation to eliminate this job requirement, to have another person help plaintiff, or to create a new position for plaintiff. Defendant also observed that plaintiff testified at his deposition that he did not need an accommodation and that he did not request any accommodation.

In opposition, plaintiff contended that defendant had a duty to provide a reasonable accommodation based on its observation of his "disability (use of a walker)" and by its belief that an accommodation was required for him to perform the job. Plaintiff argued that he could have performed the essential duties of the job with or without accommodation. To the extent that he needed an accommodation to measure jobsites on hills, plaintiff contended that there were available tools of the trade to measure hills. Plaintiff also argued that although a phone sales position became available later, defendant never contacted him and instead gave it to another employee.

The trial court determined that plaintiff at his deposition denied that he was disabled and denied that he needed an accommodation. Plaintiff also admitted that measuring, including walking the jobsite, was an essential duty of the position, that getting into some backyards would be difficult, that he needed a helper in prior jobs, and that he would need

one in working for defendant. The court determined that an employer was not required to hire an additional person to perform the essential duties of another person. The court concluded that plaintiff could not perform the essential duties of the position with or without reasonable accommodation.

On appeal, plaintiff contends that he could perform the functions of the position without an accommodation. He also argues that although defendant "insisted" that he could not perform the job without accommodation, defendant failed to accommodate him despite the availability of accommodations that would not pose an undue burden.

Under FEHA, it is unlawful for an employer "to fail to make reasonable accommodation for the known physical . . . disability of an applicant or employee." (§ 12940, subd. (m)(1).) An employer, however, is not required to make an accommodation "that is demonstrated by the employer . . . to produce undue hardship . . . to its operation." (*Ibid.*) In other words, an employer "has an affirmative duty to make reasonable accommodation(s) for the disability of any individual applicant or employee if the employer . . . knows of the disability, unless the employer . . . entity can demonstrate, after engaging in the interactive process, that the accommodation would impose an undue hardship." (2 Cal. Code Regs., § 11068, subd. (a).)[8]

"The elements of a reasonable accommodation cause of action are (1) the employee suffered a disability, (2) the employee could perform the essential functions of the job with

---

[8] "Undue hardship" is defined as "an action requiring significant difficulty or expense, when considered in light of the following factors: [¶] (1) The nature and cost of the accommodation needed. [¶] (2) The overall financial resources of the facilities involved in the provision of the reasonable accommodations, the number of persons employed at the facility, and the effect on expenses and resources or the impact otherwise of these accommodations upon the operation of the facility. [¶] (3) The overall financial resources of the covered entity, the overall size of the business of a covered entity with respect to the number of employees, and the number, type, and location of its facilities. [¶] (4) The type of operations, including the composition, structure, and functions of the workforce of the entity. [¶] (5) The geographic separateness or administrative or fiscal relationship of the facility or facilities." (§ 12926, subd. (u)(1)-(5).)

reasonable accommodation, and (3) the employer failed to reasonably accommodate the employee's disability. [Citations.]" (*Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 373.)

"California courts have construed 'reasonable accommodation to mean "a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired." ' [Citation.]" (*Wentworth v. Regents of University of California* (2024) 105 Cal.App.5th 580, 597 (*Wentworth*).) For example, a reasonable accommodation may include "[j]ob restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, . . . the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." (§ 12926, subd. (p)(2).) " 'The examples of reasonable accommodations in the relevant statutes and regulations include reallocating nonessential functions or modifying how or when an employee performs an essential function . . . .' " (*Wentworth, supra*, 105 Cal.App.5th at pp. 597-598.)

However, " '[e]limination of an essential function is not a reasonable accommodation.' [Citation.]" (*Wentworth, supra*, 105 Cal.App.5th at p. 602.) "FEHA does not obligate the employer to accommodate the employee by excusing him or her from the performance of essential functions.' [Citations.]" (*Id.* at p. 598.)

Reassignment to a "vacant" position may be a reasonable accommodation if the employee cannot perform the essential functions of the employee's own position even with reasonable accommodation, or "if both the employer and the employee agree that a reassignment is preferable to being provided an accommodation in the present position." (2 Cal. Code Regs., § 11068, subd. (d)(1)(A), (C).) An employer "is not required to create a new position to accommodate an employee with a disability to a greater extent than an employer would offer a new position to any employee, regardless of disability." (2 Cal. Code Regs., § 11068, subd. (d)(4); see *Raine, supra*, 135 Cal.App.4th at p. 1226; *Cuiellette, supra*, 194 Cal.App.4th at p. 767.)

36

Generally, an employer "is required to consider any and all reasonable accommodations of which it is aware or that are brought to its attention by the applicant or employee . . . ." (2 Cal. Code Regs., § 11068, subd. (e).) "[A]n employer need not read an employee's mind or provide accommodations of which it is unaware . . . ." (*Lin*, *supra*, 88 Cal.App.5th at p. 728; see also *King*, *supra*, 152 Cal.App.4th at p. 443.)

On appeal, regarding the cause of action for failure to provide a reasonable accommodation, plaintiff first contends that he could perform the functions of the position *without* an accommodation. This contention, along with plaintiff's deposition testimony and declaration to the same effect, are inconsistent with the allegations of the first amended complaint. In the first amended complaint, plaintiff alleged that he was disabled, that he "was able to perform the essential duties of [his] position or a vacant alternative position to which [he] could have been assigned with reasonable accommodation," and that defendant "failed to provide reasonable accommodation for [his] disability." The clear import of these allegations is that plaintiff needed a reasonable accommodation to perform the essential duties of his position and that defendant failed to provide such an accommodation. Plaintiff's evidence that he did *not* need an accommodation, in *contradiction* to the allegations of the first amended complaint, do not create a triable issue of material fact on his failure to accommodate claim. (See *Conroy*, *supra*, 45 Cal.4th at p. 1250 [explaining that the "materiality of a disputed fact is measured by the pleadings [citations], which 'set the boundaries of the issues to be resolved at summary judgment' "]; *Hutton*, *supra*, 213 Cal.App.4th at p. 493 [holding that "the burden of a defendant moving for summary judgment only requires that he or she negate plaintiff's theories of liability as alleged in the complaint"].)

Second, plaintiff contends that defendant "insisted" that he could not perform the job without accommodation and then failed to reasonably accommodate him. Regarding the availability of a reasonable accommodation, plaintiff in opposition to the summary judgment motion relied on a declaration from a general contractor with experience in

landscape design. The general contractor described "categories of tools" that "are commonly used in the construction trade" and that "may be used by a user to measure area and/or slope of terrain from either a single point in the terrain, or without visiting the site at all." However, plaintiff does not cite any evidence indicating that defendant was aware— during the interactive process or otherwise prior to litigation—of the tools, including apps, software, and other devices, described by the general contractor. An employer "is required to consider any and all reasonable accommodations of which it is aware or that are brought to its attention by the applicant or employee . . . ." (2 Cal. Code Regs., § 11068, subd. (e).) An employer is not required to provide accommodations of which it is unaware. (*Lin*, *supra*, 88 Cal.App.5th at p. 728.)

Plaintiff also refers to the inside sales or phone job as an alternative position that would have been a reasonable accommodation. However, the undisputed evidence reflects that such a vacant position did not exist. (*Cuiellette*, *supra*, 194 Cal.App.4th at p. 767 [explaining that an employer is not required to create a new position to accommodate an employee]; *Raine*, *supra*, 135 Cal.App.4th at p. 1226 [stating that "FEHA does not require the employer to create a new position to accommodate an employee, at least when the employer does not regularly offer such assistance to disabled employees"]; 2 Cal. Code Regs., § 11068, subd. (d)(4).)

Lastly, we understand plaintiff to suggest that a helper or measure technician could assist him with his job. However, measuring, which included walking the jobsite on uneven terrain and hills, was an essential function of the job. " '[E]limination of an essential function is not a reasonable accommodation.' [Citation.]" (*Wentworth*, *supra*, 105 Cal.App.5th at p. 602.) "FEHA does not obligate the employer to accommodate the employee by excusing him or her from the performance of essential functions.' [Citations.]" (*Id.* at p. 598.) Shifting the responsibility for an essential function to another employee is akin to eliminating that function from the position. As the trial court observed, plaintiff does not cite authority to support the proposition that an employer is required to

hire another employee to perform, or to have an existing employee perform, an essential function of plaintiff's position as a reasonable accommodation.

We conclude that the trial court properly granted summary adjudication of plaintiff's claim for failure to provide a reasonable accommodation.

## F. *Harassment*

In the first amended complaint, plaintiff alleged that he was harassed by defendant based on his disability.

In its motion for summary judgment, defendant contended that plaintiff was "never subjected to harassment that was severe or pervasive."

In opposition, plaintiff contended that defendant "allow[ed] [p]laintiff's disability to become the subject of office gossip." Plaintiff further argued that manager Smith "openly joked, "mocked," and made "assumptions" about plaintiff's disability in text messages to plaintiff.

The trial court determined that that the text messages did "not appear to be discriminatory based on disability" and that the conduct identified by plaintiff was not sufficiently severe or pervasive to constitute harassment under FEHA.

On appeal, plaintiff again contends that manager Smith "openly joked, "mocked," and made "hurtful assumptions" about plaintiff's disability in text messages. In support of this argument, plaintiff refers to two text messages in which Smith made the following comments: (1) "[T]he job sites we have are hard enough to walk on even for me and my two relatively good balanced legs :-)"; (2) "[T]he job . . . isn't safe without good balance"; and (3) "The things you just don't know from video interviews." Plaintiff also argues that defendant "allowed his disability to become the subject of office gossip and ma[de] sure that he knew that his disability was the subject of office chatter." Plaintiff further contends that defendant's discrimination in terminating him and refusing to accommodate him "provide[] further evidence upon which to base on inference of discriminatory animus."

FEHA prohibits an employer from harassing an employee or applicant because of a physical disability. (§ 12940, subd. (j)(1).) FEHA "harassment claims focus on 'situations in which the social environment of the workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee.' [Citations.]" (*Bailey v. San Francisco Dist. Attorney's Office* (2024) 16 Cal.5th 611, 627, italics omitted (*Bailey*).) Relevant here, "[v]erbal harassment" includes "epithets, derogatory comments or slurs" on the basis of disability. (2 Cal. Code Regs., § 11019, subd. (b)(2)(A); see *id.*, § 11002, subd. (f).)

To establish a claim for disability harassment under FEHA, the plaintiff must show that the defendant subjected the plaintiff "to harassing conduct that was (1) unwelcome; (2) because of [disability]; and (3) sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive work environment. [Citations.]" (*Bailey*, *supra*, 16 Cal.5th at p. 627 [addressing racial harassment claim under FEHA].)

The third element—whether the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment—is based on an objective standard. " 'Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond [FEHA's] purview.' [Citation.]" (*Bailey*, *supra*, 16 Cal.5th at p. 628.)

Further, the third element is "judged from the perspective of a reasonable person in the plaintiff's position. [Citations.]" (*Bailey*, *supra*, 16 Cal.5th at p. 629.) " '[C]omments or actions may appear innocent or only mildly offensive to one who is not a member of the targeted group,' but 'intolerably abusive or threatening when understood from the perspective of a plaintiff who is a member of the targeted group.' [Citation.]" (*Ibid.*) Courts "must therefore consider allegations of a . . . hostile workplace 'from the perspective of a reasonable person belonging to the [targeted] . . . group of the plaintiff.' [Citation.]" (*Ibid.*)

"Whether a work environment is reasonably perceived as hostile or abusive 'is not, and by its nature cannot be, a mathematically precise test.' [Citation.] 'The working environment must be evaluated in light of the totality of the circumstances.' [Citations.] ' "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." ' [Citations.] ' "The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." ' [Citation.] ' "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" ' are not sufficient to create an actionable claim of harassment. [Citations.]" (*Bailey*, *supra*, 16 Cal.5th at p. 628.)

The sufficiently severe or pervasive standard is " 'written in the disjunctive.' " (*Bailey*, *supra*, 16 Cal.5th at p. 629.) Consequently, " 'an isolated incident of harassment, if extremely serious, can create a hostile work environment.' [Citations.] (*Id.* at pp. 629-630.) For example, the California Supreme Court has held that "the isolated use of an unambiguous racial epithet may give rise to a triable issue of actionable harassment depending on the totality of the circumstances." (*Id.* at p. 632; see *id.* at p. 634 [finding "a triable issue of fact whether [a coworker's] one-time use of the N-word was, under the totality of the circumstances, sufficiently severe so as to create a hostile work environment"].)

In this case, we determine based on the totality of the circumstances that manager Smith's text messages and the purported office gossip did not create a triable issue regarding whether plaintiff was subjected to harassment "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment." (*Bailey*, *supra*, 16 Cal.5th at p. 627.) Smith's three comments in two text messages were made in the context of engaging in the required interactive process. As plaintiff acknowledges, the statements were in reference to plaintiff's disability and addressed "his ability to safely perform his job due to that disability." Although some of Smith's statements may have been

41

worded insensitively, it is apparent that he was addressing the physical demands of the job position and his own experience in walking the jobsites, and seeking plaintiff's input regarding his ability to perform the job. These were all proper, employment related subjects of discussion. (See § 12940, subd. (n) [requiring good faith interactive process to determine if a reasonable accommodation exists].) In making the statements, there is no indication that Smith sought to threaten or humiliate plaintiff because of his disability. The statements also do not rise to the level of an unambiguous epithet or slur. (See 2 Cal. Code Regs., § 11019, subd. (b)(2)(A); *Bailey*, *supra*, 16 Cal.5th at p. 634 [describing the N-word as "an unambiguous racial epithet"].)

We are also not persuaded by plaintiff's contention that there is a triable issue regarding harassment based on purported evidence that his disability was the subject of "office gossip" or "office chatter." In support of this contention, plaintiff cites evidence that manager Smith learned from defendant's office that plaintiff used a walker for his office visit and had a mobility issue. Smith then conveyed this information to plaintiff by text message, asking about the walker and raising the issue of the terrain of defendant's jobsites. Given plaintiff's own contention that his use of a walker for the office visit triggered defendant's obligation to engage in the interactive process, plaintiff fails to persuasively articulate why defendant's internal communication between its office personnel and manager Smith, who initiated the interactive process, constitutes "office gossip," let alone unlawful harassment under FEHA.

Lastly, plaintiff quotes *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, which held that "acts of discrimination can provide evidentiary support for a harassment claim by establishing discriminatory animus on the part of the manager responsible for the discrimination, thereby permitting the inference that rude comments or behavior by that same manager were similarly motivated by discriminatory animus." (*Id.* at p. 709.) However, we have already determined that plaintiff failed to establish a triable issue

regarding his other disability related causes of action. Those alleged acts of discrimination therefore do not create a triable issue regarding plaintiff's harassment claim.

In sum, the trial court properly granted summary adjudication of plaintiff's harassment claim.

## G. *Retaliation*

In the first amended complaint, plaintiff included a cause of action entitled retaliation in violation of FEHA. The allegations within the cause of action, however, were similar to the allegations in his disability discrimination cause of action in which he alleged that defendant had taken an adverse employment action against him based on his membership in a protected class.[9]

In its motion for summary judgment, defendant contended that plaintiff's retaliation claim failed because the evidence established that he did not engage in a protected activity and that defendant never retaliated against him for engaging in a protected activity.

In opposition, plaintiff contended that there were triable issues regarding whether he engaged in a protected activity when he (1) requested a reasonable accommodation and (2) opposed defendant's belief that he could not perform his job with or without a reasonable accommodation. Further, plaintiff argued that there was a triable issue regarding whether the termination of his employment or the refusal to hire him was motivated by his protected activity. In this regard, plaintiff contended that the termination or refusal to hire came shortly after he opposed manager Smith's discriminatory comment in a text message and shortly after he requested a transfer to a different position as an accommodation.

The trial court determined that there was no triable issue of retaliation because plaintiff testified that he never complained to defendant about anything and that no one retaliated against him.

---

[9] The only difference in plaintiff's allegations between the disability discrimination cause of action and the retaliation cause of action was that in the retaliation cause of action, he alleged that he was discriminated against based on his race.

On appeal, plaintiff again argues that he engaged in protected activities by: (1) requesting a phone sales position as a reasonable accommodation, and (2) opposing harassment and discrimination by expressing shock to manager Smith for his "two relatively good balanced legs" statement and by explaining that he had completed other landscaping projects despite his bad hip. Plaintiff also contends that a triable issue exists as to whether his termination was motivated by retaliatory animus, that is, his engagement in protected activities. In this regard, plaintiff argues that he was terminated only one day after requesting a different position as an accommodation and opposing Smith's "discriminatory" text statements.

It is unlawful for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under [FEHA]." (§ 12940, subd. (h); see § 12900.) It is also unlawful for an employer to "retaliate . . . against a person for requesting accommodation [of a disability], regardless of whether the request was granted." (§ 12940, subd. (m)(2); see *Castro-Ramirez v. Dependable Highway Express, Inc.* (2016) 2 Cal.App.5th 1028, 1049 (*Castro-Ramirez*).)

"To establish a prima facie case of retaliation under FEHA, an employee must show that (1) [the employee] engaged in a 'protected activity,' (2) the employer subjected [the employee] to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. [Citation.]" (*Bailey*, *supra*, 16 Cal.5th at p. 636.)

"For purposes of making a prima facie showing, the causal link element may be established by an inference derived from circumstantial evidence. A plaintiff can satisfy his or her initial burden under the test by producing evidence of nothing more than the employer's knowledge that the employee engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision. [Citation.]" (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 388 (*McRae*).)

44

However, " '[i]f the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation " ' "drops out of the picture," ' " and the burden shifts back to the employee to prove intentional retaliation. [Citation.]' [Citation.] . . . [T]he plaintiff cannot ' "simply show the employer's decision was wrong, mistaken, or unwise. Rather, the employee ' "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' [citation], and hence infer 'that the employer did not act for the [. . . asserted] non-[retaliatory] reasons.' [Citations.]" [Citations.]' [Citation.]" [Citation.]' [Citation.] 'The ultimate burden of persuasion on the issue of actual [retaliation] remains with the plaintiff.' [Citation.]" (*McRae*, *supra*, 142 Cal.App.4th at pp. 388-389.)

Here, plaintiff failed to establish a triable issue regarding whether defendant's termination of his employment or its refusal to hire him was motivated by his protected activity. Plaintiff contends that he engaged in protected activity (1) by requesting a reasonable accommodation from manager Smith for a phone sales position, (2) by expressing shock to Smith about the two balanced legs comment, and (3) by explaining to Smith that he had completed other landscaping jobs despite his hip issue. Assuming one or more of these acts constituted protected activity, defendant in its summary judgment motion provided plaintiff's deposition testimony in which he stated that he did not know of any retaliation by Smith.

Plaintiff contends that a triable issue of retaliatory animus nevertheless exists based on the short proximity in time (one day) between his protected activities and the termination of employment or the refusal to hire. (See *Castro-Ramirez*, *supra*, 2 Cal.App.5th at pp. 1048-1049.) He also argues that evidence of harassment is probative of whether defendant's adverse actions were motivated by retaliatory animus. (See *Lewis v. City of Benicia* (2014) 224 Cal.App.4th 1519, 1535.)

45

However, "a mere temporal relationship between an employee's protected activity and the adverse employment action, while sufficient for the plaintiff's prima facie case, cannot create a triable issue of fact if the employer offers a legitimate, nonretaliatory reason for the adverse action. [Citation.]" (*Light v. Department of Parks & Recreation* (2017) 14 Cal.App.5th 75, 94; accord, *Nadaf-Rahrov v. Neiman Marcus Group, Inc*. (2008) 166 Cal.App.4th 952, 990; *Loggins v. Kaiser Permanente Internat*. (2007) 151 Cal.App.4th 1102, 1112-1113; *McRae*, *supra*, 142 Cal.App.4th at p. 388.) In this case, plaintiff's retaliation cause of action contained nearly identical allegations to his disability discrimination cause of action. Regarding the disability discrimination cause of action, defendant provided evidence that plaintiff was not allowed to commence training because he could not perform the essential functions of the position with or without an accommodation. Regarding the retaliation claim, plaintiff failed to provide evidence that would support a reasonable inference that defendant's reason was pretextual and that he was instead fired for a retaliatory motive. (See *Nadaf-Rahrov*, *supra*, at pp. 990-991.) For example, plaintiff's reliance on purported evidence of harassment, which we have already concluded was properly summarily adjudicated, does not create a triable issue regarding whether defendant's termination of plaintiff's employment was motivated by retaliatory animus.

In sum, the trial court properly granted summary adjudication of plaintiff's retaliation cause of action.

## H. *Wrongful Termination*

Plaintiff acknowledges that his cause of action for wrongful termination in violation of public policy was "premised on" his claims under FEHA. "Under California law, if an employer did not violate FEHA, the employee's claim for wrongful termination in violation of public policy necessarily fails. [Citations.]" (*Featherstone v. Southern California Permanente Medical Group* (2017) 10 Cal.App.5th 1150, 1169.) In this case, we have determined that summary adjudication was properly granted on each of plaintiff's claims

under FEHA. Consequently, the trial court properly granted summary adjudication of the claim for wrongful termination in violation of public policy.

### I. *Punitive Damages*

We have concluded that the trial court properly granted summary judgment. Consequently, we need not separately consider whether defendant was entitled to summary adjudication of plaintiff's claim for punitive damages. (*Today's IV v. Los Angeles County Metropolitan Transportation Authority* (2022) 83 Cal.App.5th 1137, 1193 [explaining that the appellate court did not need to reach the issue of punitive damages because judgment was properly entered in the defendant's favor; "[p]unitive damages are merely incident to a cause of action, and can never constitute the basis thereof"]; see Civ. Code, § 3294, subd. (a) [a plaintiff may recover punitive damages "in addition to the actual damages" in "an action for the breach of an obligation not arising from contract"].)

### III. DISPOSITION

The judgment is affirmed.

_____
Greenwood, P. J.

WE CONCUR:

_____
Grover, J.

_____
Lie, J.

H052884
Smith v. Black Diamond Paver Stones & Landscape, Inc.